IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| EDWARD LEE SUNDERLAND | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No.: 5:12-cv-00020 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL ASTRUE, | ) | By: Hon. Robert S. Ballou |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Edward Lee Sunderland ("Sunderland") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") determining that he was not disabled and therefore not eligible for disability insurance benefits ("DIB") under the Social Security Act ("Act") 42 U.S.C. §§ 401-433, 1614(a)(3)(A). Specifically, Sunderland challenges the Commissioner's denial of benefits on the grounds that (1) the Administrative Law Judge ("ALJ") gave insufficient weight to the medical opinions of record, (2) the ALJ improperly failed to employ a medical expert to provide additional testimony, (3) the ALJ should have found at least a closed period of disability, and (4) that additional evidence he submitted to the Social Security Administration's Appeals Council warrants remand.

This court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before me by referral pursuant to 28 U.S.C. § 636(b)(1)(B). The case is ripe for decision. I have carefully reviewed the administrative record, the legal memoranda, the argument of counsel, and the applicable law. I conclude that substantial evidence supports the Commissioner's decision, that Sunderland's claims of error are without merit, and that the additional evidence does not warrant

1

remand. Accordingly, I **RECOMMEND DENYING** Sunderland's Motion for Summary Judgment (Dkt. No. 14), and **GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. No. 18).

**I.**

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that the claimant failed to demonstrate that he was disabled under the Act. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

The plaintiff bears the burden of proving that he suffers under a "disability" as that term is interpreted under the Act. English v. Shalala, 10 F.3d 1080, 1082 (4th Cir. 1993) (citing 42 U.S.C. § 423(d)(5)). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his

impairments prevent engaging in any and all forms of substantial gainful employment given the claimant's age, education, and work experience.  See 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process to evaluate a disability claim.  Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002).  The Commissioner asks, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment;[1] (4) can return to his past relevant work; and if not, (5) whether he can perform other work.  Heckler v. Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520).  The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process.  20 C.F.R. § 404.1520(a)(4).  The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability.  The burden shifts to the Commissioner at the fifth step to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies.  42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

In cases such as this, where the claimant has submitted additional evidence to the Appeals Council, and the Appeals Council considered that evidence, this court must review the record as a whole, including the new evidence, to determine whether substantial evidence supports the Commissioner's findings.  Wilkins v. Secretary, Dept. of Health and Human Servs., 953 F.2d 95-96 (4th Cir. 1991).

---

[1] A "listed impairment" is one considered by the Social Security Administration "to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 404.1525(a).

II.

**Social and Vocational History**

Sunderland was born February 4, 1960. R. 153. He completed the 9th grade, which is considered a limited educational background. R. 50-51. The record does not indicate if he obtained a GED. Sunderland stopped working in November, 2007. R. 47. His prior work history consists primarily of long haul tractor trailer truck driving. Sunderland also worked as a poultry line worker, mobile home salesperson, and plumber. R. 51, 156-69, 175, 220-37. The work as a truck driver is considered medium and semi-skilled work; the work as a mobile home salesperson is considered light, skilled work. R. 51. Sunderland's wife described his daily activities as getting up around 10 a.m., eating, and watching television most of the day. She reported that Sunderland occasionally goes to the store, does some laundry, or attends physical therapy, but that "[m]ost days [he] stays at home watching [television] until [it is] time go to bed." R. 185. Sunderland described his own daily activities as eating, watching television, feeding cats, and going out in the yard to walk. R. 199. Sunderland also detailed his daily activities to include reading the paper, watching television, doing laundry, and doing some house cleaning, such as sweeping the floors. R. 44, 249.

**Claim History**

Sunderland filed his claim for DIB on July 20, 2010. R. 153. He claims a disability onset date of November 5, 2007. R. 132. The Commissioner denied Sunderland's application initially and upon reconsideration. R. 75-79, 82-83. Administrative Law Judge ("ALJ") Brian Kilbrane held a hearing on July 28, 2011, at which Sunderland, represented by counsel, and a vocational expert testified. R. 35-59. The ALJ issued his decision denying Sunderland's claim on July 28, 2011. R. 19-32. In his opinion, the ALJ found that Sunderland suffered from the

severe impairments of osteoarthritis, status post myocardial infarction with stent implantation, and bipolar disorder. R. 21. The ALJ found Sunderland's carpal tunnel syndrome and hypertension were non-severe impairments. R. 21. The ALJ found that none of these impairments, either individually or in combination, did not meet or medically equal a listed impairment. R. 21.

The ALJ determined that Sunderland retained an RFC to perform a range of medium work, which allows him to stand/walk for about six hours during an eight hour workday, sit for about eight hours during an eight hour workday, lift/carry fifty pounds occasionally and twenty-five pounds frequently. The ALJ found that Sunderland has minimal restrictions in his abilities to reach, handle, feel, grasp, finger objects, bend, stoop, crouch, and squat, and has moderate limitations in his abilities to maintain attention/concentration for extended periods, perform activities within a schedule, work in coordination with or in proximity to others without being distract by them, make simple work-related decisions, interact appropriately with the general public, and accept instructions and/or react appropriately to criticism from supervisors. The ALJ found that Sunderland has the ability to perform simple, routine work tasks in a competitive work environment with little or no contact with others. R. 23. The ALJ further found that Sunderland is unable to perform any past relevant work, but that there are jobs, which exist in significant numbers in the national economy, which Sunderland can perform, given his age, education, work experience, and RFC. R. 31. As such, the ALJ concluded Sunderland is not disabled. R. 32.

Sunderland filed an appeal with the Social Security Administration's Appeals Council ("AC") and included four additional exhibits in his request of review. On February 13, 2012, the AC denied Sunderland's request for a review of the ALJ's decision, thereby rendering the

decision of the ALJ the final decision of the Commissioner. R. 1-5. On February 24, 2012, Sunderland filed his complaint in this court seeking judicial review of the ALJ's decision (Dkt. No. 1).

## III.

Sunderland asserts four claims in support of his memorandum in support of his motion for summary judgment. Sunderland claims that (1) the Administrative Law Judge ("ALJ") gave insufficient weight to the medical opinions of record, (2) the ALJ improperly failed to employ a medical expert to provide additional testimony, (3) the ALJ should have found at least a closed period of disability, and (4) that additional evidence he submitted the Social Security Administration's Appeals Council warrants remand. I find no merit to these claims.

**Medical Opinions of Record**

Dr. James Styron

Sunderland argues that the ALJ erred in the weight given to the opinion of Dr. James Styron, Sunderland's treating psychiatrist. Dr. Styron found that Sunderland had a number of severe limitations and had suffered three episodes of decompensation[2] within twelve months of each other. R. 122, 802. The ALJ, however, afforded this opinion little weight, finding that the medical record did not support the extreme limitations found by Dr. Styron, and that Dr. Styron had inaccurately recounted Sunderland's history of decompensation episodes. R. 30. Because substantial evidence supports the ALJ's decision to give little weight to Dr. Styron's opinion, I must reject Sunderland's argument.

---

[2] An episode of decompensation is defined by the Social Security Administration as an exacerbation or temporary increase in symptoms accompanied by a loss of adaptive functioning. Typically, these symptoms manifest in a loss of social relationships or difficulty maintaining concentration, persistence or pace in activities. See 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 12.05C4.

6

A physician, psychiatrist, or other acceptable medical source is considered a treating source when that source "provides or has provided the claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant." Meyer v. Astrue, 662 F.3d 700, 705 n.1 (4th Cir. 2011) (citing 20 C.F.R. § 404.1502). A treating physician's opinion is not automatically entitled to controlling weight. Treating physicians' opinions are given controlling weight only if they are supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with other substantial evidence in the record. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations…."); Social Security Ruling ("SRR") 96-2p.[3]

When determining whether a treating physician's opinion is to be given controlling weight, it is appropriate for the ALJ to consider the evidence in support of the opinion and to determine the opinion's consistency with the record as a whole. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. The ALJ must consider a number of factors regarding the treating physician's opinion, including whether the physician has examined the applicant, the existence of an ongoing physician-patient relationship, the diagnostic and clinical support for the opinion, the opinion's consistency with the record, and whether the physician is a specialist. 20 C.F.R. §§ 404.1527(c), 416.927(c). Generally, whenever an ALJ does not give the treating physician's opinion

---

[3] "Social Security Rulings are interpretations by the Social Security Administration of the Social Security Act. While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995) (citing Han v. Bowen, 882 F.2d 1453, 1457 (9th Cir. 1989)).

7

controlling weight, the ALJ is required to give specific reasons for the weight given to the treating physician's medical opinion and those reasons must be supported by the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); SSR 96-2p.

The ALJ gave Dr. Styron's opinion little weight because he found it was inconsistent with Dr. Styron's own records and that it inaccurately recounted Sunderland's periods of decompensation. R. 30. Specifically, the ALJ found that the extreme limitations Dr. Styron listed in his opinion were inconsistent with the medical evidence of record, including treatment notes which showed that medication well controlled Sunderland's bipolar disorder. R. 30. The record supports the ALJ's finding.

Dr. Styron listed rather severe limitations for Sunderland in his May 1, 2011 medical source statement. Specifically, Dr. Styron found that Sunderland was unable to meet competitive standards in his ability to maintain attention for a two hour segment, maintain regular attendance and punctuality, work in coordination with/or proximity to others without being unduly distracted, complete a normal workday and workweek without interruption from psychologically based symptoms, accept instructions and respond appropriately to supervisors, get along with co-worker or peers without unduly distracting them, respond appropriately to changes in a routine work setting, deal with normal work stress, deal with the stress of semiskilled and skilled work, interact appropriately with the public, and maintain socially appropriate behavior. R. 120-21, 800-01. Dr. Styron also found that Sunderland has extreme functional limitations in maintaining social functioning, marked functional limitations in maintaining concentrating, persistence, or pace, and would be expected to miss more than four days of work per month due to his impairments or treatment. R. 122, 802.

Dr. Styron's progress notes do not bear out such severe limitations. Specifically, Dr. Styron stated that Sunderland did well after his treatment regimen was reestablished after a three day period of decompensation in August, 2009. Sunderland reported a "marked improvement in mood" to Dr. Styron on September 24, 2009. R. 708. His mood overall was doing well on November 5, 2009. R. 707. In January 26, 2010, Sunderland reported feeling the "best [he had] in five years." R. 706. Dr. Styron saw Sunderland nine more times during the relevant time period and Sunderland's mood was always "good" or "ok" and his progress was often characterized as "stable." R. 702-05, 749-55. Sunderland saw his family doctor, Dr. James Evans, on February 4, 2011, who noted that Sunderland was "going to see a psychiatrist who is dealing with his bipolar disorder [presumably Dr. Stryon] and feels that he is functioning very well." R. 790. The last time Dr. Stryon saw Sunderland was May 31, 2011; Sunderland's mood was again "ok" and his progress "stable." R. 749.

Dr. Styron also stated that Sunderland suffered from three episodes of decompensation lasting at least two weeks in duration during a twelve month period. R. 122, 802. The ALJ was correct in finding this description inaccurate. The medical record reflects that Sunderland only had two periods of decompensation, that these periods were not within twelve months of each other, that only one was during the relevant time period, and that neither were two weeks or longer in duration. Specifically, Sunderland suffered an episode of decompensation in on February 14, 2004, prior to his alleged onset date. He was admitted to the hospital for severe depression and suicidal ideation. His Wellbutrin prescription was increased, and he was given Lamictal and Trazodone. He participated in individual, group, and milieu therapy. On February 17, 2004, he was discharged in stable condition. R. 324-25, 337-39. Sunderland did not have another episode of decompensation again until August 14, 2009, when he reported to the hospital

9

for suicidal ideation. R. 578. He "had decompensated with the discontinuation of his medications" and "his treatment regimen was re-initiated." Sunderland "was able to re-compensate quickly with the re-initiation of his treatment regimen." R. 579. He was discharged on August 17, 2009. R. 579-80. Based on this record, I find that the ALJ did not err in the weight he assigned to Dr. Styron's opinion.[4]

Dr. Damien LaPar

Sunderland also argues that the ALJ failed to give proper weight to the opinion of Dr. Damien LaPar, who performed a consultative examination of Sunderland on October 25, 2010. R. 729-35. Dr. LaPar performed a detailed physical examination of Sunderland, including observing Sunderland's ability to ambulate, taking his vital signs, examining his eyes, neck, and nodes, listening to his lungs and heart, scrutinizing his abdomen and extremities, and testing his range of motion, motor strength, reflexes, and sensory responses. R. 733-34. The ALJ gave great weight to Dr. LaPar's opinions regarding Sunderland's physical functioning, noting that Dr. LaPar is an expert in his field and that his opinions were consistent with the medical evidence of record, including the treatment notes relating to Sunderland's physical functioning. R. 30.

In contrast, the ALJ afforded little weight to Dr. LaPar's statement regarding Sunderland's mental functioning, which was as follows:

> [T]he claimant's history of bipolar disorder and past history of hospitalizations indicate that the claimant may have significant disability from a social and functional standpoint from time to time. This obviously hinders his ability to

---

[4] As the ALJ did not find Dr. Sytron's severe limitations fully credited, and as that decision is supported by the record, it is obvious that the ALJ did not commit any error in ignoring the vocational expert's response to a hypothetical question premised on those discredited severe limitations. For a vocational expert's opinion to be relevant, it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments. Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005) (quoting Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989)).

10

>     maintain employment. I believe this should be considered during his disability evaluation.

R. 734-35. The ALJ found that this portion of Dr. LaPar's opinion was based on Sunderland's subjective reports and was not consistent with the medical evidence of record. R. 30. Dr. LaPar's report supports this finding. In contrast to his detailed physical examination of Sunderland, Dr. LaPar's examination of Sunderland's mental state was limited to what Dr. LaPar observed during his exam—that Sunderland was alert and oriented, able to hear and comprehend normal conversational speech, spoke fluently and comprehensibly, had normal mood and affect, linear and logical thought process, and demonstrated a normal fund of knowledge, memory, and concentration. R. 732.

Additionally, Dr. LaPar specifically detailed his review of Sunderland's medical records. R. 729-30. The only mental health record he reviewed was Sunderland's hospitalization for bipolar disorder in August, 2009. R. 729. This limited review of Sunderland's mental health records was supplemented by Sunderland's self reporting. Sunderland told Dr. LaPar that "as a result of his bipolar disorder he has had a lot of problems keeping jobs" and that it was "very difficult to maintain jobs when his bipolar becomes a problem." R. 730. Sunderland also told Dr. LaPar that "as a result of his bipolar disorder, he had been unable to obtain a medical release or do any work." R. 731. The record, therefore, supports the ALJ's conclusion that Dr. LaPar's mental assessment was based primarily on Sunderland's subjective reports. There is no evidence in the record that Sunderland was unable to obtain a medical work release due to his bipolar disorder. Nor did Sunderland report losing a job due to bipolar disorder to any of the mental health care professionals treating him. Not only does this information Sunderland provided to Dr. LaPar appear to be inaccurate, but it is also well-settled that a doctor does not transfer

subjective complaints into objective medical evidence by merely recording them. See Craig v. Chater, 76 F.3d 585, 590 n.2 (4th Cir. 1996).

The ALJ correctly noted that Dr. LaPar is not a mental health specialist. Finally, the ALJ properly characterized Dr. LaPar's mental functioning opinion as a "non-specific statement." R. 30. Indeed, Dr. LaPar comments regarding Sunderland's mental functioning did little more than repeat Sunderland's report of his own condition and advise that Sunderland's mental health issues be considered in his disability determination. As such, I find that the record supports the weight the ALJ assigned to Dr. LaPar's mental health opinion.

**Use of a Medical Expert**

Sunderland argues that the ALJ erred in failing to employ a medical expert to testify at the hearing "to ascertain questions concerning medical opinions from treating doctors." Pl.'s Br. 10. Sunderland states that "[t]he ALJ cannot substitute himself . . . for a medical expert and reach a medical conclusion when objective medical evidence, facts and evidence from treating physicians support that claimant's medical condition meets or equals a listed impairment." Pl.'s Br. 10. Sunderland cites McCarthy v. Barnhart, CIV.A. 5:04CV00070, 2005 WL 1118159 (W.D. Va. May 11, 2005), for the proposition that the ALJ lacks the medical expertise to determine whether a claimant's impairments meet or equal a listing at Step 3 and therefore must have input from a physician in making such a determination. Pl.'s Br. 10. Importantly, McCarthy does not hold that a medical expert is necessary at Step 4 in determining a proper RFC. Here Sunderland does not assert that he meets any particular Listing.[5] An ALJ can solicit

---

[5] Even assuming Sunderland asserted that he did meet a listing, this case is readily distinguishable from McCarthy. In McCarthy, the claimant's treating physician interpreted an MRI study to indicate that the claimant met or equaled a listed impairment. The ALJ rejected this opinion, undertook his own review, and found that the claimant did not meet or equal any listing. The court found that the ALJ did possess sufficient medical expertise to reach such a

12

the assistance of a medical source, but there is no rule requiring the use of a medical expert in determining the function limitation a claimant has when determining an appropriate RFC. See 20 C.F.R. § 404.1527(e)(2)(iii) (stating that ALJ's *may* solicit the opinions of medical experts); see also France v. Apfel, 87 F. Supp. 2d 484, 489-90 (D. Md. 2000) ("While the ALJ is free to contact physicians, psychologists or other medical sources if the record is inadequate . . . the ALJ does not otherwise have an obligation to obtain additional information if the record is adequate to make a determination regarding a disability claim."). For these reasons, I find that the ALJ did not err by declining to request a medical expert to testify at Sunderland's hearing.

**Closed Period of Disability**

At the hearing before this court, Sunderland argued for the first time that he should be granted at least a closed period of disability, and that the case should be remanded so that the Commissioner can focus on whether Sunderland was disabled during a set period of time. The ALJ's opinion, while not specifically discussing a closed period, clearly reflects that the ALJ considered whether Sunderland's impairments, alone or in combination, ever rendered him unable to perform substantial gainful activity for a period of twelve months or greater.

The ALJ considered the various medical problems Sunderland faced during the relevant period, but found any debilitating effects were resolved relatively quickly. As to Sunderland's

---

conclusion. McCarthy, 2005 WL 1118159, at *2. Here, the ALJ did not draw his own medical conclusion. Instead, the ALJ properly relied on the opinions of the state agency physicians. R. 23. "[T]he disability determination and transmittal forms signed by the State agency physicians provided the required medical opinion that the plaintiff's impairments did not equal a listed impairment." Lee v. Astrue, CIV.A. 6:11-1518-TMC, 2012 WL 5384398, at *8 (D.S.C. Sept. 20, 2012) (citing Smith v. Astrue, 457 F. App'x 326, 328, 2011 WL 6188731, at *1 (4th Cir. 2011) (per curiam)), report and recommendation adopted, CIV.A. 6:11-1518-TMC, 2012 WL 5386539 (D.S.C. Oct. 31, 2012). Furthermore, social security "regulations authorize, but do not mandate, an ALJ to request and consider opinions from medical experts in determining whether a claimant's impairments equal those of any listed impairment." Stapleton v. Astrue, 206CV00053, 2007 WL 1959175, at *6 (W.D. Va. July 3, 2007); see also 20 C.F.R. § 404.1527(e)(2)(iii).

13

heart heath, the ALJ noted that Sunderland experienced a heart attack during the relevant period, but that there was no evidence Sunderland consistently experienced cardiac symptoms that would be considered disabling. R. 30. There is substantial evidence to support this finding. After Sunderland's heart attack on November 5, 2008, R. 370-73, 527-34, 652-675, he underwent cardiac rehabilitation. R. 466. By December 3, 2008, he was doing well and asked to continue his cardiac rehabilitation at Gold's Gym. R. 536. After a stress test, Sunderland was given permission to start his physical therapy and a gradually increasing exercise program. R. 540, 544. On March 24, 2009 Sunderland reported to Dr. Stewart Pollock, his treating cardiologist, that he was doing thirty minutes of cardio exercise three-to-four times a week at Gold's without any chest pain and that "overall [he was] feeling quite good about his overall health." R. 547. Sunderland did not have further medical treatment for cardiac issues.

As to Sunderland mental health, the ALJ noted that Sunderland experienced a period of decompensation during the relevant period, but that it "took place in the setting of the claimant self-discontinuing his psychoactive medications" and that Sunderland "quickly recompensated after restarting his medication regimen." R. 579. This language is taken almost verbatim from the treatment records themselves, which state that Sunderland "had decompensated with the discontinuation of his medications" and that he "was able to re-compensate quickly with the re-initiation of his treatment regimen." R. 579.

Finally, the ALJ considered the findings of Dr. O. Winston Cameron, Sunderland's treating orthopaedist. R. 29. Dr. Cameron performed surgery on Sunderland's right shoulder in April, 2008. He found Sunderland was unable to return to work on April 15, 2008 and again May 16, 2008. R. 480, 482. The ALJ found that these opinions reflect Sunderland's "functioning at that point in his recovery" and "are not reflective of [Sunderland's] functioning

14

during a [twelve] month period . . . ." R. 29. Dr. Cameron performed a subsequent procedure on Sunderland's shoulder in April 2009. R. 375-87, 440-45, 448-50, 756-69. As the ALJ noted, Dr. Cameron released Sunderland to perform light work on May 28, 2009. R. 29, 437. Thus, there is substantial evidence to support the ALJ's conclusion that Dr. Cameron's work restrictions related to Sunderland's shoulder impairment were limited to Sunderland's recoveries from his surgeries and do not reflect an inability to perform substantial gainful activity for a period of twelve months or greater.

Ultimately, the ALJ found that Plaintiff was not disabled at any time from his alleged onset date through the date of his decision. "Implicit in this finding is the fact that Plaintiff was not entitled to a closed period of disability at any relevant time." Atwood v. Astrue, 5:11CV002-RLV-DSC, 2011 WL 7938408, at *6 (W.D.N.C. Sept. 28, 2011) report and recommendation adopted, 5:11-CV-00002-RLV, 2012 WL 1858764 (W.D.N.C. May 22, 2012). Because the ALJ's decision is supported by substantial evidence, there is no basis for remand to consider a closed period.

**Additional Evidence Submitted to the Appeals Council**

Sunderland submitted four exhibits to the AC: (1) medical record from Rockingham Memorial Hospital, dated August 22, 2011; (2) a medical source statement from Dr. James Styron, dated September 16, 2011; (3) medical records from Rockingham Memorial Hospital, dated October 17-21, 2011; and (4) medical records from Rockingham Memorial Behavioral Health, dated October 17-24, 2011. Sunderland argues that remand is appropriate pursuant sentence six of 42 U.S.C. § 405(g) for the ALJ to consider new and material evidence. "A claimant seeking a remand on the basis of new evidence . . . must show that the evidence is new and material and must establish good cause for failing to present the evidence earlier." Wilkins

v. Sec'y, Dep't of Health and Human Servs., 953 F.2d 93, 96 n.3 (4th Cir. 1991). Evidence is new if it is not duplicative or cumulative; it is material if there is a reasonable possibility it would have changed the outcome of the Commissioner's decision. Id. at 96. Sunderland has the burden of demonstrating that a remand is appropriate given any new and material evidence. Meadows v. Astrue, CIVA 5:08-CV-01129, 2010 WL 1380117, at *3 (S.D.W. Va. Mar. 31, 2010).

Here, Sunderland has not articulated why the evidence submitted to the AC is "new and material" beyond stating that these medical records "demonstrate that [his] severe mental impairment and experiences with periods of decompensation" and that they were "not available for the hearing of [July 28], 2011." Pl.'s Br. 12. Assuming both these statements are true, the fact remains that all of these records are outside the relevant time period. Sunderland provides no explanation as to how or why these records relate back to Sunderland's condition during the relevant period. As such, they do not provide any basis for remand.

## **RECOMMENDED DISPOSITION**

For the foregoing reasons, it is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The clerk is directed to transmit the record in this case to the Honorable Michael F. Urbanski, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not

specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection.

          Enter: July 24, 2013

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge